UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTINE MCLAUGHLIN, CRYSTAL
VANDERVEEN, JUSTIN LEMBKE,
SCOTT HARDT, Individually and behalf of
all Others similarly situated,

        Plaintiffs,                        CLASS and COLLECTIVE ACTION
                                              Case No: 3:22-cv-00059-HES-MCR

V.

SELECT REHABILITATION LLC

        Defendant.

---

**PLAINTIFFS' UNOPPOSED MOTION FOR APPROVAL OF SETTLEMENT AGREEMENT AND ENTRY OF STIPULATED JUDGEMENT**

        Plaintiffs CHRISTINE MCLAUGHLIN, CRYSTAL VANDERVEEN, and JUSTIN LEMBKE (collectively, "Named Plaintiffs") individually and on behalf of all Opt In Plaintiffs (together with Named Plaintiffs, "Plaintiffs"), have reached a fully executed settlement with Select Rehabilitation LLC ("Defendant" or "Select") on both the Claims for Wages under the FLSA, and Plaintiff's integral claim for reimbursement of fees and costs as prevailing Plaintiffs.  After multiple prior unsuccessful mediations during this years-long litigation, the Parties met for an in-person settlement conference on July 2, 2025, in Miami, which was attended by a principal of Defendant and Plaintiffs' accounting expert, and reached the framework for a tentative settlement.

This decision, made after three separate mediations/settlement conferences and lengthy settlement negotiations, was precipitated by many years of contentious litigation and thorough investigation, such that Plaintiffs believe the settlement satisfies all the criteria for approval under Lynn's Foods and respectfully request the Court approve the Settlement Agreement attached as Exhibit 1, and approve the Parties' separately negotiated settlement[1] of Plaintiffs' attorney's fees and costs as mandated by Section 216(b) of the FLSA.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 14, 2022, Named Plaintiff McLaughlin, later joined by Vanderveen and Lembke, commenced this "off the clock" (OTC) overtime wage collective action under the FLSA, 29 U.S.C. §§ 207, 216(b) on behalf of two groups (aka "classes"): a) all hourly paid Program Managers (aka Directors of Rehab) (PM); and b) all Therapists who primarily worked at skilled nursing facilities as well as at other outpatient facilities Select contracted with to provide therapy services to their residents or patients.[2] Plaintiffs contend that Select imposed unrealistic productivity requirements on Therapists, whereby often 90% or more of their recorded hours had to be billable, which caused them to routinely work "off-the-clock" to meet these productivity requirements. Plaintiffs further attested in sworn declarations and

---

[1] Bargained-for provisions on attorney's fees in a settlement agreement control the issue of attorney's fees. Embree v. Medicredit, Inc., 752 F. App'x 697, 700 (11th Cir. 2018) (citing Pottinger v. City of Miami, 805 F.3d 1293, 1300 (11th Cir. 2015)).

[2] For purposes of this litigation, "Therapists" includes hourly paid employees holding any of the following positions: occupational therapist, occupational therapy assistant, physical therapist, physical therapy assistant, and speech language pathologist. Defendant later conceded that all PM were hourly paid employees.

testified in several plaintiff depositions that Select and its management had actual knowledge that therapists and PM were routinely working off-the-clock without being paid for all overtime hours worked. Select vehemently denied, and continue to deny, these allegations.

On March 3, 2023, this Court granted Plaintiffs' Motion for Conditional Collective Action certification and issuance of notice to all those similarly situated in 2 groups: a) Therapists and b) all hourly paid Program Managers and directors of rehab (DE 163). Thereafter, Notice of this action was delivered to approximately 34,882 present and former employees of Select. There are 1179 Plaintiffs in this case.

Throughout the 3 years and 7 months this case had been pending, Select vigorously contested that any of the Plaintiffs worked off--the--clock. Select disputes the number of hours the Plaintiffs claim to have worked off-the-clock and denies that its actions violate the FLSA. Select also maintains that its productivity and efficiency benchmarks were guidelines rather than mandatory performance requirements wand which were never enforced against the Plaintiffs could not be the cause of any Therapist or PM to suffer to work off the clock. Select further maintains that it has complied with all applicable law regarding wages and overtime. Meanwhile, Plaintiffs not only obtained numerous sworn declarations from program managers, but also from a regional manager who declared that Select highly scrutinized and enforced productivity as a requirement on therapists and PM. Moreover, Plaintiffs obtained emails and text messages from regional managers which likewise support this contention. Thus, a dispute of fact remained for a jury to decide on this.

3

The Parties attended two mediations prior to the July 2025 settlement conference. Both of the prior mediations impassed. From March through April 2024 the parties mediated before Magistrate Judge Patricia Barksdale which resulted in an impasse. Next, the parties met live in Houston on Feb. 4, 2025, with experienced wage and hour mediator, Dennis Clifford, Esq. This mediation also impassed, as the parties remained far apart. In the months leading up to the February 4 mediation, Select delivered a voluminous cache of ESI in the form of files and spreadsheets containing millions of bytes of data evidencing login times and other transaction data showing Plaintiffs' work activities in Select's databases. Thereafter, Plaintiffs initiated settlement inquiries with Select, leading to the Parties meeting for a settlement conference in Miami on July 2, 2025, and standing down on the discovery, depositions and litigation.

After the extensive negotiation, Plaintiffs were satisfied that this settlement was the highest sum they could achieve to resolve this matter, such that the Parties moved forward with reducing the settlement to written agreements (EXHIBIT 1, and Attachment A (Fee Stipulation)) which they present to the Court for approval.

## I.    SUMMARY OF THE SETTLEMENT TERMS

### A.    The Settlement Fund For The Plaintiffs

The Settlement Agreement establishes a Qualified Settlement Fund of $2,500,000.00 (the "Gross Settlement Amount") from which all the Plaintiffs' individual settlement payments will be made from, including separately negotiated General Releases. Moreover, while the settlement provides for $25,000 to be paid to

appointed claims administrator for administration of this settlement, this cost is not being deducted up front from the fund; instead, this cost is to come from the returned and voided settlement checks monies which by operation of this agreement, after a certain date are void and would be due to be remitted back to Select. Only if these voided checks do not meet the $25,000 will the QSF money fund any of the claims administrator's costs then. See the Settlement Agreement, Exhibit 1. Exactly $1,300,000 is being paid by Select to resolve the wage claims of the PM Plaintiffs, and $1,200,000 is paid to resolve the claims of the Therapist Plaintiffs.

**B.    Eligible Employees**

Each one of the 1179 Plaintiffs is eligible to receive a share of the settlement proceeds, pursuant to the pro rata allocation laid out in the settlement agreement and summarized below. Of those Plaintiffs, approximately 363, are to receive a minimum payment of $25.00 if a Therapist or $50.00 if a PM because either their total individual settlement share is below this floor or was 0$ because of not 1 single full time workweek in the 3 year statute of limitations). Further, to prevent the unfairness of a Therapist who had for example $12 in unpaid wages receiving less than the $25 payment, all Therapists who have less than $25 in damages will receive $25. Similarly, all PM with less than $50 in unpaid wages will receive $50.

**C.    Payment Plan and Timing**

The Plaintiffs agreed to a settlement which includes a payment plan for Select to fund the settlement with four installments over a 2-year and 4-month period of time. Plaintiffs' counsel thus must continue to counsel upwards of 730 clients who will

receive installment payments over the next 2 plus years after approval of the settlement, dedicating time and resources to monitor, counsel clients and ensure the payments are made.

### D.    Settlement Payment Allocation for the Plaintiffs

With the assistance of their expert, Plaintiffs' attorneys prepared numerous sophisticated, complex damages models over the years of this litigation included within each, multiple variations and scenarios for settlements. These models took into account those workweeks in which a Plaintiff took time off (PTO, vacation, etc.) and those weeks a Plaintiff could not have reached overtime where their hours fell below a threshold under the 40-hour mark.

In the damages model relied upon for reaching and negotiating the settlement and to be used for the plaintiffs' settlement payment allocation, Plaintiffs' counsel calculated damages for Plaintiffs based upon identifying eligible workweeks, defined as any workweek in which a Plaintiff could have clocked more than 36 hours of actual work time in a workweek for PM and 39 hours for Therapists. Then, these workweeks were applied against the average hours per week for each Therapist and each PM from declarations and surveys of hours claimed to have worked. As per the Settlement Agreement, Defendant is paying the sum of $2,500,000.00 in wages and liquidated damages, which is equitably divided into 2 separate funds: One for the PM Plaintiffs who will be allocated $1,300,000 and a 2nd Fund of $1,200,000 payable to the Therapist Plaintiffs. The funds were divided from the gross settlement amount based

upon the Plaintiffs' total estimated wages at issue contained in Plaintiffs' counsel's damages model to thus obtain an equitable division.

### E.    Settlement Claims Administration

The parties have agreed to jointly select ILYM Group Inc. to serve as the Settlement Administrator.  ILYM was selected after a competitive bidding process, to ensure that the costs of settlement administration would be reasonable.

### F.    The Rule 23 Claims Are to Be Withdrawn and An Amended Complaint Will Be Filed In the Docket For Conformance

As part of this bargained for settlement, Plaintiffs have agreed to withdraw and dismiss the Rule 23 Illinois Class action claim.  Following Select's disclosures, it was apparent to Plaintiffs that continuing to litigate over this class action claim for thousands of employees and many millions of dollars in damages put the 1179 Plaintiffs in this case at tremendous risk of both a greatly diminished recovery or, a zero ($0) dollar recovery.  Thus, Plaintiffs agreed in consideration of the payment of the $2.5 million in satisfaction of their claims for wages and liquidated damages, to withdraw and dismiss the Class action claim.  Attached to the Settlement Agreement is the <u>Plaintiffs' Fourth Amended Complaint</u> which removes the class action claims and removes Scott Hardt as a representative FLSA named Plaintiff, as he was appointed for the Rule 23 class only.  This 4th Amended Complaint is to be filed with the Court upon approval of this Settlement for conforming the pleadings to the Settlement terms.

### G.    The Settlement Includes A Separately Negotiated Stipulated Sum to Resolve Plaintiffs' Hourly Attorneys' Fees And Costs and Expenses

Select required an end of all litigation to make any payment to Plaintiffs to settle their wages claims and required a number with certainty it could budget for in lieu of litigating the amount of fees in a second major litigation.  Thus, the parties reached an arms-length, negotiated compromise on the amount of fees and costs to be paid to Plaintiffs' counsel, which was negotiated separately and without impacting the $2,500,000.00 Select had agreed to pay to the Plaintiffs to settle the wage claims.  The issue of attorneys' fees and costs is addressed more fully in Plaintiffs' separate Supplemental Memorandum In Support Of Stipulated Attorneys' Fees, which is being filed simultaneous with this Motion to approve the settlement. See Exhibit 4.

## MEMORANDUM OF LAW

I.    **THIS SETTLEMENT MEETS ALL THE FACTORS FOR APPROVAL AS A FAIR AND REASONABLE COMPROMISE OVER A BONA FIDE DISPUTE**

Parties are required to seek court approval of a private settlement of a claim for back wages arising under the FLSA.  The Eleventh Circuit has held that:

> [t]here are only two ways in which back wage claims arising under the FLSA can be settled or compromised by employees.  First, under section 216(c), the Secretary of Labor is authorized to supervise payment to employees of unpaid wages owed to them.  The only other route for compromise of FLSA claims is provided in the context of suits brought directly by employees against their employer under section 216(b) to recover back wages for FLSA violations.

*Lynn's Food Stores, Inc. v. United States Dep't of Labor*, 679 F.2d 1350, 1352-53 (11th Cir. 1982). Before approving an FLSA settlement, the Court must scrutinize it to determine if it is "a fair and reasonable resolution of a bona fide dispute." *Id*. at 1354-55.  If the settlement reflects a reasonable compromise over issues that are actually in dispute,

the Court may approve the settlement "in order to promote the policy of encouraging settlement of litigation." *Id.* at 1354.

The only participants in this settlement thus are clients of the undersigned Plaintiffs' Collective Counsel by the execution of their Consent to Join forms, and who are party plaintiffs.  Sending notice of this settlement to others similarly situated who are not plaintiffs or clients, is not occurring here.  More importantly, all the opt-in party Plaintiffs in this case expressly agreed by their written consent forms to be bound by a settlement reached by the named Plaintiffs and their attorneys in their consent to join forms.  No other present or former Select employees are being notified of this action or being invited to participate other than plaintiffs, and who are clients of the plaintiffs' attorneys of record.

## II.    THE SETTLEMENT IS FAIR AND REASONABLE AND SHOULD BE APPROVED

"The federal courts have long recognized a strong policy and presumption in favor of class settlements." *George*, 369 F. Supp. 3d at 1367.  "Compromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank*, 216 U.S. 582, 595 (1910).  Indeed, there is a "policy of encouraging settlement of litigation." Lynn's Food Stores, Inc. v. U.S., 679 F.2d 1350, 1354 (11th Cir. 1982).  A strong presumption exists to find a settlement fair and reasonable.  *Hamilton v. Frito-Lay, Inc.*, 2007 WL 219981, at *2 (M.D. Fla. Jan. 26, 2007).

### A.    The Bennett Factors

In determining whether the settlement is internally fair and reasonable, the Courts sometimes consider the following factors: 1) the existence of fraud or collusion behind the settlement; 2) the complexity, expense, and likely duration of the litigation; 3) the stage of the proceedings and the amount of discovery completed; 4) the probability of the plaintiff's success on the merits; 5) the range of possible recovery, and 6) the opinions of the counsel. *See Leverso v. South Trust Bank of Ala., Nat. Assoc.*, 18 F.3d 1527, 1531 n.6 (11th Cir. 1994); *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), (the Bennett Factors). Regardless of these factors, this Court, which has presided over this bona fide dispute now for 3 years and 9 months, and has lived this case with the parties, is in a position to use its discretion and experience from its involvement in approving this settlement as a fair and reasonable.

### 1.    The Settlement Was Negotiated Free From Collusion

The settlement reached was the result of hard-fought, adversarial, arm's length negotiations that have taken place over protracted and costly litigation that has been ongoing for over now three (3) years and (9) months. In determining whether a settlement was negotiated at arm's-length, courts look to whether there was "vigorous and comprehensive litigation" or whether the settlement was a result of collusion among the parties. *Pickett v. IBP*, 2001 U.S. Dist. LEXIS 22453 (M.D. Fla. Dec 21, 2001). Here the settlement was negotiated at arm's-length by experienced counsel, free from fraud or collusion, and only after 2 earlier mediations impassed, including a protracted mediation before Magistrate Judge Barksdale from March to May 2024, and then another before a private mediator in February 2025, which ended without

10

any negotiations which approached the terms settled for herein nor which ever reached

the point of even discussing Plaintiffs legally entitled fees and costs. Meanwhile, then

Plaintiffs were forced to incur substantial attorney's fees and costs all along this way.

Moreover, "[t]he Court, however, has neither the duty nor the right to reach

any ultimate conclusions on the issues of fact or law which underlie the merits of the

dispute... In fact, absent fraud, collusion or the like, the Court should be hesitant to

substitute its own judgment for that of experienced counsel representing the class." *In

re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D. Ga. 1993).

The Parties were able to settle this action only after they mutually engaged in

exhaustive, costly and time consuming discovery, including many depositions, ESI

analysis and only after significant years of presenting discovery disputes to the Court

for resolution. *See Diaz v. Hillsborough County Hos. Authority*, 2000 U.S. Dist. LEXIS

14061, *11 (M.D. Fla. Aug. 7, 2000) (quoting *Cotton*, 559 F.2d at 1330) (Absent fraud

and collusion, the court not only may rely on the judgment of experienced counsel but

"should be hesitant to substitute its own judgment for that of counsel"). Looking at

this Court's docket with 459 docket entries, and the extensive discovery and large

number of discovery and evidentiary hearings before this Court, as well as multiple

motions for sanctions, this alone establishes the extreme adversarial nature of this

litigation, and the benefits of a compromised settlement.

As often said by courts in this district, and elsewhere within the 11th Circuit,

when the amount to be paid to the plaintiffs was negotiated separate from the sum the

Defendant agreed to pay the plaintiffs, such as here where the payment is not part of

any percentage of a gross common fund but the compromise over the actual and incurred lodestar fees by Plaintiffs counsel, there is no indicia of collusion here.

In regard to Plaintiffs' incurred attorney's fees and costs, more fully addressed in Plaintiffs' Supplemental Memorandum, scrutiny is not required where the parties stipulate that the sum to be paid "was agreed upon separately and without regard to the amount paid to the plaintiff." *Bonetti v. Embarq Mgmt. Co*., 715 F. Supp. 2d 1222, 1228 (M.D. Fla. 2009). Where such a stipulation is made, and the settlement is otherwise reasonable on its face, there is no reason to conclude that the Plaintiff's recovery "was adversely affected by the amount of fees paid to his attorney." Id. The Court should find that the settlement was the result of arm's-length bargaining, and without any indicia of collusion, especially here where the fees to be paid by Select are not from a % from some common fund or a % of the wages to be paid, but a separate settlement from negotiations over Plaintiffs' attorneys incurred lodestar fees and costs and which resulted in Plaintiffs counsel taking a voluntary reduction to end this case.

## 2.    The Complexity, Expense and Duration of this Litigation

With respect to the complexity, expense, and duration of litigation, "[t]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma*, *supra,* 406 F. Supp. 2d at 1323. "The law favors compromises in large part because they are often a speedy and efficient resolution of long, complex, and expensive litigations." *Behrens*, 118 F.R.D. at 543.

This action was filed January 14, 2022, and settlement was preceded by more than 3.5 years of heavy, contentious, hard-fought and complex discovery and litigation, including appearances at numerous court hearings including evidentiary hearings, and many depositions by both sides. The case was made additionally complex due to the contentious disputes related to efforts to discover and obtain the time and date stamped ESI of Plaintiffs' work activities from the Net Health databases of Casamba and Optima.

Further, the Parties engaged in formal discovery, including exchanging millions of files, documents, payroll and time records, emails, work records, data and information, and hundreds of additional ESI files and spreadsheets with time and date stamped data. Plaintiffs' counsel conducted multiple depositions of Defendant's IT officers and deposed corporate representatives two times. Plaintiffs had to retain and pay 2 different forensic computer and IT professionals in this action, who were crucial in ultimately obtaining the sampling of the Net Health ESI records. This involved a total of 4 depositions of Select's CTO, including a July 14, 2024, live evidentiary hearing and a court ordered deposition with Plaintiffs' computer and IT expert at the courthouse in November 2024. This discovery, depositions, and hearings over the ESI dramatically multiplied the fees and costs incurred to the tune of millions of dollars to both sides. Once the ESI was obtained, Plaintiffs' expert consultant Marty Williams performed a highly sophisticated analysis of the Net Health records and compared the same to the Time records which facilitated this settlement finally being reached.

### 3.    The Stage of the Proceedings

The next factor, the stage of the proceedings at which settlement was achieved, also weighs in heavy favor of approval. To evaluate this factor, the Court looks to whether Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation. *Lipuma*, 406 F. Supp. 2d at 1324; *Behrens*, 118 F.R.D. at 544.

As of July 2, 2025, the Parties expended 3.6 years on this case between its commencement on January 14, 2022, and the tentative settlement reached on or about July 2, 2025. Their experienced counsel continued to negotiate over the terms and conditions of the Settlement Agreement and other related documents for 3 more months until reaching this settlement. Still pending is a Rule 23 class certification motion which Select has yet to respond to, and Plaintiffs as well anticipated filing a reply brief and additional evidence from records obtained and from depositions taken since the Motion for Class Certification was filed in May 2024. As to class certification, if the same were granted by the court, Plaintiffs and Defendant believe that class discovery alone would take yet 12 full months and would be followed with motions for decertification of the Class action and the conditionally certified collective action, briefing which would extend the case another 6 months or longer.

Moreover, both Parties desired additional depositions. Assuming Plaintiffs took 10 to 15 more depositions and Select 25 or more, the cost would easily exceed $200,000 and fees would exceed $1,500,000 on both sides. Thus, after 3.5 years, due to significant and time-consuming discovery disputes, much more discovery and depositions were needed by Plaintiffs such that the case is still only ½ way into

discovery for both sides. The foreseeable litigation ahead would cause the fees and costs at issue to dwarf the wages recovered in this settlement.

Plaintiffs here as well factor in the risk that Defendant could prevail on a motion for decertification at the close of discovery such that this case would never proceed to trial. Defendant has argued throughout this litigation that the differences between Plaintiffs—e.g., their six different job titles, their disparate geographic locations, different direct managers, and differences in whether and how frequently Plaintiffs met their productivity targets—warrant decertification of a collective. While Plaintiffs strongly disagree, they also recognize that the risk does exist and some courts have granted decertification in large wage cases. *Botero v. Commonwealth Limousine Serv.*, Civil Action No. 12-10428-NMG, 2014 WL 1248158, at *4 (D. Mass. Mar. 25, 2014) (denying conditional certification and noting that even if employer failed to pay every one of its chauffeurs at some point for time spent waiting with their vehicles, the circumstances surrounding each instance are different and not the result of a "single decision, policy, or plan that violated the law") (internal citation omitted).

Neither party had fully completed discovery sufficient to reach expert witness discovery, nor completed even a fraction of the depositions both sides sought. Thus, the remaining discovery would undoubtedly cause millions of dollars in fees and costs to be incurred for both sides. As to the Rule 23 class action, as to which the Motion for Class Certification was still pending, same would have added thousands of class members into the case, and would have added an estimated 2 additional years of

discovery issues, disputes, records production and ESI for a substantial sampling of the class members before depositions would even be ready to be taken by either side.

Also, of importance for the Plaintiffs is that their opportunity for a trial or for any settlement would be pushed for an unknown number of years into the future, with greater risk that neither would come to a favorable result or fruition. With near certainty, this case would require a two-week to multiple months long jury trial (depending upon the Court's Ruling on Rule 23 Class Certification) over the questions of fact and amount of damages using representative testimony.[3] To prove their claims, Plaintiffs would incur extensive costs involving additional depositions and other discovery costs, assuming they prevailed on any filed motions for decertification of the collective or of a Rule 23 class if certified. Plaintiffs would also need to incur costly forensic computer analysis and more ESI discovery and third-party subpoenas and witness depositions. Further, the Parties would likely require one or more experts related to the underlying claims and/or defenses. Thus, settlement is a reasonable means for both Parties to minimize their future risks and litigation costs through a lengthy jury trial, not even including any appeals that might occur.

### 4. The Probability of Success at Trial

"The Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but to evaluate the proposed settlement in its totality." *Lipuma v. Am.*

---

[3] The Plaintiffs filed a motion for Class Certification, which remained uncertain, subject to motion for decertification after likely 8 months or more of discovery. Thus, if 30 or more Plaintiffs and class members had to testify at trial, the trial could conceivably last 1 or more months.

*Express Co.*, 406 F. Supp.2d 1298,1323 (S.D. Fla 2005). "[T]the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate." *Behrens,* 118 F.R.D. at 542. "The likelihood of success at trial is weighed against the amount and form of relief contained in the settlement." *Lipuma at* 1319. "The Court, however, has neither the duty nor the right to reach any ultimate conclusions on the issues of fact or law which underlie the merits of the dispute... In fact, absent fraud, collusion or the like, the Court should be hesitant to substitute its own judgment for that of experienced counsel representing the class." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 315 (N.D. Ga. 1993).

First, in considering trial, Plaintiffs would have to be able to secure commitments of a representative group of PM and Therapist Plaintiffs who would commit to attending a trial in Jacksonville, FL, and for the 1-2 weeks this trial might take. Assuming the issue of Select's liability survives a summary judgment challenge, Plaintiffs assess that they had a very strong probability of prevailing on liability at trial. This is not a case involving any exemption defense and is strictly an "off-the-clock" claim in which Plaintiffs believe the evidence demonstrates that Select has actual knowledge of Therapists, PM and these Plaintiffs actually working off the clock. Select, on the other hand, hotly contests that conclusion.

A trial on the merits would also involve significant risks for Plaintiffs—not just as to damages, but on liability as well. Plaintiffs here have not asserted that Defendant maintains any formal, written policy requiring them to work off-the-clock in order to meet productivity targets. Instead, Plaintiffs assert that, as a matter of policy and

practice, Defendant encouraged and at least tacitly coerced such off-the-clock work and suffered or permitted such work to occur. The existence of an official policy is not necessarily required to prevail on an off-the-clock claim such as this. *See, e.g., Loy v. Rehab Synergies, LLC.*, 71 F.4th 329, 338 (5th Cir. 2023) (rejecting the proposition, in an appeal involving similar FLSA allegations, that "company policies requiring FLSA compliance and prohibiting off-the-clock work" are "dispositive given the evidence that Rehab Synergies also had an unwritten policy or practice of off-the-clock work."). Establishing the existence of such an unwritten policy that applied to nearly 1,200 Therapists and PM necessarily requires significant fact development and would likely turn, at least at some level, on credibility determinations by the jury. Plaintiffs firmly assert that such a policy of suffering or permitting therapists and PM to work-off-the-clock to try to hit high productivity targets was in place at Select. But a jury could conclude otherwise based on the evidence, as Defendant contends. And that risk makes the current settlement even more fair and reasonable under the circumstances.

Meanwhile, Select argues in its defense that not only would a jury reject the application of the 3-year limitation period, but that it would prevail on its good faith defense, given its written time keeping policy. Success at trial is also dependent upon a group of Plaintiffs who would both commit to attend trial and testify. Given the length of time already elapsed, it may be difficult to secure such testimony, which may weaken Plaintiffs chances of a greater success at trial than the settlement obtained herein. Numerous Plaintiffs called upon by Select for deposition, even sought to drop their claims rather than even submit to a 3 hour deposition. Getting a representative

18

group of Plaintiffs to attend as trial in Florida for 1 to 2 weeks brings upon numerous other risks and uncertainties.

### 5.    The Range of Possible Recovery and Defendant's Ability to Withstand a Higher Judgment

As to damages, the range of possible recovery must assess the likelihood that Plaintiffs could obtain a judgment greater than the $2,500,000 obtained from Select in this settlement.  Plaintiffs' counsel believe that they could prove to the jury that Select's time keeping records are inaccurate such that the Supreme Court's burden shifting of *Anderson v. Mt. Clemons Pottery* would apply and may lead to a paper judgment in an amount over the $2.5 million settlement obtained.

However, continued litigation is laced with multiple risks.  The risks of going forward and overcoming Select's good faith defense; obtaining a willfulness finding; getting past motion(s) for decertification; obtaining a finding of liability; and then getting a jury to award on a representative basis hours which equate to damages greater than $2.5 million is far from certain, especially when Select has presented testimony and evidence of a pay policy which could impact the award of liquidated damages. Further, when asked to appear for depositions, some plaintiffs just refused and asked to forfeit their claim and dismiss them from the case leading to concerns that if litigation continued the number of plaintiffs who would refuse to sit for deposition or appear for a trial would substantially decrease.  Moreover, who knows what a jury would say, and thus, the possibility of a better result is both uncertain and a gamble for the Plaintiffs.

The Settlement Agreement establishes a total settlement fund of $2,500,000.00 (the "Gross Settlement Amount") from which settlement payments to the 1179 Plaintiffs will be made, and exclusive from fees and costs. This fund is divided up among the 2 classes certified in the Court's order: Class A, the Program Managers and Class B, the Therapists, with the sum of $1,300,000 for the PM Plaintiffs and the sum of $1,200,000 for the Therapist Plaintiffs. The average overtime hours claimed and at issue for PM was near 9.5 hours per week, while the average claimed for Therapists was about 4 hours per week. However, PMs nearly every workweek hit a full 40 hours when not using PTO, thus no gap time was at issue, whereas Therapists time records showed they had gap times as not clocking 40 hours, such that using the 4-hour average would need to be reduced as the unrecoverable gap times factored in. All this information was then factored into arriving at a pro rata allocation of the gross settlement sum for the PM and Therapist groups of Plaintiffs to be as equitable for the Plaintiffs as humanly possible instead of the alternative of inequitably treating the individual wage claims of the PM and Therapist Plaintiffs as totally equal values, which they do not have. The calculations show that the individual settlement payments for non $50 recipients, totaling 74 PM equates to an average of recovery of $18,447.97 (meaning ½ are receiving higher sums) for the PM receiving above the minimum payments. For Therapists, the range of recovery for the non-$25 Plaintiffs (total is 736) averages to $1,453.93 and for Therapists at the high end, approximately $10,000. The allocation is equitable, using payroll and time records and applying each

individual Plaintiffs' actual rates of pay such that someone whose overtime rate is $75.00 is awarded higher sums than someone whose overtime rate is $50.00.

Based on the considerations, risks and factors described above, the range of possible recovery in reality must be considered to be as low as mere pennies on each dollar to even $0.00, but less than the $2.5 million recovered in this settlement. The greater the sum of any judgment, the greater the risk that Select would not be in any position to pay that judgment, let alone any attorney's fees and costs. *See Leon-Martinez v. Cent. Cafe & Deli*, 2017 WL 2257352, at *3 (S.D.N.Y. May 22, 2017) ("Additionally, defendants' dire financial condition justifies the settlement amount."); *Mascol v. E&L Transportation*, 2009 WL 10701164, at *4 (E.D.N.Y. Mar. 24, 2009) ("The most significant factor in favor of approval here is the financial condition of the defendants and their inability to withstand a greater judgment.").

### 6.    Opinions of Counsel

The Settlement Agreement is the culmination of numerous settlement discussions, 2 prior full day mediations, the exchange and review of many thousands of employer records, files and ESI and over 3.5 years of protracted, costly, complex and exhaustive discovery and litigation. Many party and witness depositions were taken in this action as well. "A 'presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.'" *Matheson v. T-Bone Rest., LLC,* 2011 U.S. Dist. LEXIS 143773 (S.D.N.Y. Dec. 13, 2011) (quoting *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 116 (2d Cir. 2005)). Additionally, the use

of a mediator further demonstrates that no collusion occurred. *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001) (a "mediator's involvement in precertification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure.") cited by *Carpenters Health & Welfare Fund v. Coca-Cola Co.*, No. 1:00CV-2838-WBH, 2008 U.S. Dist. LEXIS 121093 (N.D. Ga. Oct. 20, 2008).

This case bears all the indicia of fairness warranting approval as set forth in Lynn's Foods because Plaintiffs were represented by very experienced FLSA counsel, who, in the "adversarial context of a lawsuit" engaged in "serious, informed, arms-length negotiations" of "a bona fide dispute with respect to liability [and] amounts due under the Act," resulting in a fair, and reasonable compromise of claims in settlement. See *Lynn's Foods*, 679 F.2d at 1353-54. See Declarations of Mitchell Feldman, Andrew Frisch, which present opinions from experienced class and collective action attorneys supporting this settlement. Ex's 2 and 3. From Plaintiffs' counsel's many years of experience in similar complex, large-scale FLSA collective actions, they express their opinions that this settlement a substantial recovery of the collective members' alleged and claimed unpaid wages, and a fair and reasonable settlement as compared to other FLSA collective actions. Declarations of Feldman and Frisch. Ex 2,3.

Select now has 3 law firms and multiple attorneys of record in this case, and includes such experienced, respected wage and hour, nationally recognized class and collective action firms as Foley & Lardner and Morgan Lewis, who first entered this case in January 2025. Plaintiffs agree that it was Morgan Lewis' experience in class

and collective action cases which proved instrumental in bringing the parties together to ultimately reach this settlement.

Further, Plaintiffs' counsel believe that the risks and costs of continuing forward are far outweighed by the benefits to the Plaintiffs in accepting the $2.5 million in resolution of these claims which Select has agreed to pay to end this litigation.  <u>See Declarations of Feldman, Frisch</u>.  Thus, based upon their extensive experience in wage and hour collective and class actions, Plaintiffs' Counsel believe that on inspection, this Court will join them in concluding that the proposed Settlement Agreement is fair, reasonable and worthy of approval.  <u>Declarations:  Feldman, Frisch: Ex. 2, 3.</u>

During the course of litigation, Plaintiffs' counsel had the opportunity to review voluminous documents and information related to Select's business, including but not limited to time and pay data, policies and procedures, and other business-related information. Plaintiffs' counsel also had the opportunity to depose several key Select executives.  Over the course of the last 12 months, Plaintiffs' counsel, independent from anything disclosed or shared by Select Rehabilitation LLC to Plaintiffs' counsel, learned of and reviewed publicly available financial information about the healthcare industry and developed information regarding the closure of many healthcare facilities across the country, including several with which Select had done business.

Thus, based on review of records obtained during the course of litigation, combined with the given significant risks of continued, protracted and costly litigation, and concerns that Select would not be able to withstand payment of a greater judgment, particularly as related to a company in an industry that recently has seen

significant closures, Plaintiffs' counsel determined that the Settlement amount Select was willing to pay to resolve Plaintiffs wages, negotiated over the course of more than a year and a half and over two mediations, including before Magistrate Judge Barksdale, to be fair, reasonable and in the best interests of the plaintiffs at this juncture.

Not only does Defendant not oppose this motion, but Defendant's attorneys have collaborated worked with Plaintiffs' counsel over 2 months to crafting this motion and thus to seeking approval of this settlement. For all of these reasons, the Parties' settlement agreement should be accepted as fair and reasonable and should accordingly be approved by this Court.

### 7. The Voluntary General Releases Are Supported by Separate Consideration and Do Not affect the Reasonableness of the Settlement

Named Plaintiffs voluntarily agreed to execute general releases in exchange for separate additional consideration to be paid by Select. (Settlement Agreement section 13). The releases are attached to the Settlement Agreement as Exhibit 2. The execution of the releases was entirely voluntary and not a condition of the FLSA settlement. The parties negotiated the amounts, and both parties received additional benefits from this agreement: Select gets the waiver of all other claims and the Plaintiff receives extra consideration. The release is not subject to approval under *Lynn's Foods*, and where it's supported by separate consideration for waiving other claims the same should not be any issue here for the Court.

24

"Courts in this District have approved general releases where a plaintiff received adequate, additional consideration in exchange, even where Plaintiff compromised their FLSA claims. *See Wilburn*, 6:14-cv-1557-Orl-37TBS, Doc. 18 at *6; *Presha v. BC 2 Holdings, Ltd. Liab. Co.*, No. 8:25-cv-781-MSS-CPT, 2025 U.S. Dist. LEXIS 142811 (MDFL July 25, 2025); Kidd v. Wawa, Inc., No. 5:23-cv-694-BJD-PRL, 2024 U.S. Dist. LEXIS 94524 (M.D. Fla. May 28, 2024); *Tennis v. Bel-Mac Roofing Inc*, No. 3:17cv14-MCR/CJK, 2019 U.S. Dist. LEXIS 250337, at *5 (NDFL Feb. 21, 2019); *Burch v. TTC Performance Prods., Inc.*, 6:20-cv-537-Orl-40EJK, Doc. 19 at *6-7 (M.D. Fla. Feb. 8, 2021), R and R adopted, Doc. 20 (M.D. Fla. Mar. 9, 2021); *De Leon v. T-Mobile United States*, No. 6:20-cv-943-PGB-DCI, 2021 U.S. Dist. LEXIS 255317 at *12-13 (M.D. Fla. July 14, 2021); *Serbonich v. Pacifica Ft. Myers, LLC*, 2018 U.S. Dist. LEXIS 92595 *3-4 (M.D. Fla. May 29, 2018) R and R adopted, 2018 U.S. Dist. LEXIS 90711, (M.D. Fla. May 31, 2018); *Garcia v. B&B Trucking Servs., Inc.*, 2017 U.S. Dist. LEXIS 118780 *2 (M.D. Fla. July 12, 2017); R and R adopted, 2017 U.S. Dist. LEXIS 117729, (M.D. Fla. July 27, 2017)." *Karichkowsky v. Crafty Crab St. Pete Inc.*, No. 8:24-cv-676-CPT, 2024 U.S. Dist. LEXIS 221876, at *5-6 (M.D. Fla. Dec. 9, 2024); *Smith v. Aramark Corp.*, No. 6:14-CV-409-ORL, 2014 U.S. Dist. LEXIS 155744 *4 (M.D. Fla. Nov. 4, 2014)(the existence of a general release clause in a settlement agreement supported by separate consideration does not render the settlement unfair or unreasonable); *Holley v. Sebek Kirkman LLC*, No. 6:15-cv-1626-Orl-40GJK, 2016 U.S. Dist. LEXIS 76510 *4 (M.D. Fla. May 26, 2016), adopted 2016 U.S. Dist. LEXIS

76506 (M.D. Fla. June 13, 2016); *Strickland v. Air Tech Servs. of Pasco* 8:20-cv-439-T-36SPF, 2020 U.S. Dist. LEXIS 74414 *3-4 (M.D. Fla. Apr. 20, 2020).

## III. THE PARTIES REACHED A SEPARATE, ARMS LENGTH NEGOTIATED SETTLEMENT OF PLAINTIFFS' PREVAILING FEES AND COSTS AS CONTAINED IN ATTACHMENT A "JOINT STIPULATION AND SETTLEMENT OF PLAINTIFFS' FEE AND COSTS"

Plaintiffs have included with this Motion, a supplemental memorandum in support of the Parties' <u>Joint Stipulation and Settlement of Plaintiffs' hourly attorney's fee and Costs</u> in order to fully brief the court. As per <u>Attachment A</u>, the separate stipulation and fee and cost settlement agreement, Select has agreed to pay, and Plaintiffs' counsel has agreed to accept the gross sum of $2,500,000.00 to resolve their hourly fees and all costs and expenses of this litigation, and which does not impact the sum Select has agreed to pay to Plaintiffs to settle their wage claims. See *Bonetti v. Embarq Mgmt. Co.*, 715 F. Supp. 2d 1222, 1228 (M.D. Fla. 2009). Plaintiffs' counsel voluntarily accepted less than their lodestar fees, as neither party and Plaintiff's counsel wanted to be forced to engage in a costly, time consuming, second major litigation over the quantum of Plaintiffs' attorneys' fees and costs. If left to battle over this recovery before the court, the Parties would incur hundreds of hours in time and fees, likely retain experts, and would file motions, briefs, replies and rebuttals. This process would likely include depositions regarding reasonable fees, and what could be yet another year of litigation. The Parties thus negotiated a settlement of these fees and costs and which the parties agree is fair, reasonable settlement and compromise over what Plaintiffs' counsel incurred and sought. Plaintiffs' counsel are not taking

any percentage or amount of money from the settlement sum Defendant is paying to settle the Plaintiffs' claims at issue in the litigation. This militates toward a finding of reasonableness.

## **CONCLUSION**

For the reasons set forth above, the Plaintiffs respectfully request the Court issue an order: (1) approving this FLSA settlement as fair, adequate, and reasonable; (2) approve of the agreed upon and stipulated separate payment in resolution of Plaintiffs' incurred attorneys' fees costs and expenses; and (3) dismissing this case with prejudice and 4) as per *Lynn's Foods*, entering judgment for the Plaintiffs.

Respectfully submitted October 31, 2025.

/s/ Mitchell Feldman
Mitchell L. Feldman, Esquire
Florida Bar No. 0080349
FELDMAN LEGAL GROUP
12610 Race Track Road, Suite #225,
Tampa, FL 33626
Tel: 813-639-9366
Fax: 813-639-9376
mfeldman@flandgatrialattorneys.com
mail@feldmanlegal.us
*Lead Counsel for Plaintiffs*

<u>CERTIFICATE OF CONFERRAL LR 3.01(g)</u>

The undersigned, lead counsel for Plaintiffs, advises the Court that the parties have

conferred on this motion and the relief sought, including the approval of the settlement

and all terms and conditions, as to which Defendant does not oppose this motion and

equally wants this settlement approved.

<u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of

Court by using the CM/ECF system.  Parties may also obtain a copy directly from the

CM/ECF system.

<u>/s/Mitchell L. Feldman</u>
Mitchell L. Feldman, Esquire
Florida Bar No.: 080349